UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HSW ENTERPRISES, INC.,<br><br>                              Plaintiff,<br><br>                    v.<br><br>WOO LAE OAK, INC., individually and<br>d/b/a WOO LAE OAK SOHO and WOO LAE OAK<br>BEVERLY HILLS, WOO LAE OAK 50, INC.,<br>individually and d/b/a BANN RESTAURANT, and<br>YOUNG SOOK CHOI,<br>                              Defendants. | 08 Civ. 8476 (LBS)<br><br>**MEMORANDUM<br>& ORDER** |

SAND, J.

         Plaintiff HSW Enterprises, Inc. ("HSW") and Defendants Woo Lae Oak, Inc. et

al. ("WLO") bring cross-motions for partial summary judgment relating to WLO's failure

to make license fee payments under the parties' 2007 License Agreement ("License

Agreement").  The Court finds that the doctrine of licensee estoppel bars WLO from

challenging the validity of HSW's trademark, and grants partial summary judgment to

HSW and denies partial summary judgment to WLO to that extent.  As to the personal

liability of Defendant Young Sook Choi ("Choi"), the Court grants WLO's motion for

summary judgment insofar as piercing the corporate veil is inappropriate in this case, but

reserves decision as to whether Choi can be held personally liable for trademark

infringement.

## I.        Background

         In 1946, Jin Keon Jang ("Jang") opened a restaurant called "Woo Lae Oak" in

Seoul, Korea.  (Paik Aff. ¶ 2.)  Jang and Chun Bong Lee ("Lee"), each with children from

prior marriages, eloped to the United States in the early 1970s.  (Def's. Mem. Opp. Pl's

Mot. Summ. J. 2.)  Beginning in 1975, the couple founded four Woo Lae Oak restaurants in (1) Beverly Hills, (2) New York City, (3) Tyson's Corner, Virginia, and (4) Jakarta, Indonesia.  (Choi Aff. ¶ 2.)  Jang and his family also opened a Woo Lae Oak restaurant in Chicago in 1996.  (Choi Aff. ¶ 6.)

In the late 1990s, there were disputes between Jang and Lee regarding property division.  (Choi Aff. ¶ 5.)  Lee passed away in 1998.  (Choi Aff. ¶ 3.)  Jang and his family, doing business as HSW, Inc., assumed ownership and management of the Virginia and Chicago locations.  (Choi Aff. ¶ 8.)  Lee's family, doing business as Woo Lae Oak, Inc., assumed ownership and management of the New York and Beverly Hills locations.  (Choi Aff. ¶ 9.)

Unbeknownst to Lee, Jang registered the Woo Lae Oak service mark ("Mark") with the U.S. Patent and Trademark Office in 1976.  (Choi Aff. ¶ 4.)  In 1997, Jang assigned the rights to the mark to HSW.  In 2000, HSW sued WLO in the Southern District of New York for trademark infringement.[1]  The case was discontinued with prejudice and without costs to either party by an order dated May 18, 2001 because the parties had informed Judge Baer that all claims were settled or in the process of being settled.  (Paik Aff. Ex. E.)  Neither party applied to have the case reopened, but the parties dispute whether or not a settlement was ever effectuated.

The parties entered into a licensing agreement in 2007, whereby WLO was granted a ten year license to use the Mark in connection with the New York and Beverly Hills restaurants, and WLO was to pay HSW a total of $400,000 in five installments. (HSW 56.1 Ex. F.)  The License Agreement provides for a late payment fee of $300 a day, as well as payment of the non-breaching party's legal fees in the event of a breach.

---

[1] The case was captioned *H.S.W. Enterprises, Inc. v. Woo Lae Oak, Inc.*, No. 00 Civ. 5582 (HB).

(HSW 56.1 Ex. F.)  In the License Agreement, WLO acknowledged that HSW was the owner of the Mark and agreed that it would do "nothing inconsistent with [HSW's] intellectual property rights in the Mark."  (HSW 56.1 Ex. F.)  WLO made the first two installment payments of $50,000 each in July and August of 2007, but has not made any other payments.  The parties dispute whether the 2007 License Agreement was meant to effectuate a settlement of the litigation dismissed in 2001.

HSW brought this action, alleging breach of contract for the missed payments, *inter alia*, and now moves for partial summary judgment on this claim.  WLO brings a cross motion for summary judgment seeking (i) a declaration of non-infringement of the Mark, rescission of the License Agreement, and damages; and (ii) dismissal of the claims against Defendant Young Sook Choi in her individual capacity.

## II.      Standard of Review

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A material fact is one that might affect the outcome of a suit under governing law.  *Kinsella v. Rumsfeld*, 320 F.3d 309, 311 (2d Cir. 2003).  A "genuine" issue exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When deciding cross-motions for summary judgment, the Court analyzes each motion on its own merits, drawing all reasonable inferences in the light most favorable to the nonmoving party.  *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).

### III.    Discussion

The parties do not dispute that WLO has failed to make payments owing to HSW under the terms of the License Agreement.  WLO bases its opposition to HSW's motion for partial summary judgment and its own motion on the naked licensing doctrine.  HSW responds that such an argument is estopped by the doctrine of licensee estoppel.

Licensee estoppel is an equitable doctrine that bars a licensee from disputing the validity of the licensor's trademark on the theory that in entering the agreement, the licensee has assented to the validity of the mark.  "A 'no challenge' provision in a license agreement," such as the one in the parties' License Agreement, "makes the estoppel clear and explicit."  3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 18:63 (4th ed. 2009).  Licensee estoppel is premised on the maxim that "one should not be permitted to challenge the validity of a trademark while reaping its benefits."  *Papercraft Corp. v. Gibson Greeting Cards, Inc.,* 515 F. Supp. 727, 728 (S.D.N.Y. 1981).  The doctrine is "equitable in nature and is not subject to rigid application."  *Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.,* 153 F. Supp. 2d 512, 520 (S.D.N.Y. 2001), *aff'd,* 43 Fed. Appx. 408 (2d Cir. 2002).

The Court of Appeals for the Second Circuit has held that the *Lear, Inc. v. Adkins*, 395 U.S. 653 (1969) balancing test used to determine the propriety of licensee estoppel in the patent context should be applied in the trademark context as well.  *Idaho Potato Comm'n v. M & M Produce Farm & Sales*, 335 F.3d 130 (2d Cir. 2003), *cert. denied*, 124 S. Ct. 2066 (2004).  The *Lear* balancing test as applied to trademarks requires a "balancing of the public interest in favor of challenging invalid trademarks against the

private interest in predictable contractual relationships."  3 J. THOMAS MCCARTHY,

MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 18:63 (4th ed. 2009).

　　　　We first inquire into the public interest served by a challenge to a trademark based

on the naked licensing doctrine.  Trademark law imposes an affirmative duty on a

licensor to exercise quality control over the licensee's product.  *Dawn Donut Co. v.

Hart's Food Stores, Inc.,* 267 F.2d 358, 362 (2d Cir. 1959).  The purpose of this duty is to

prevent the public from being misled into thinking it will receive a product of similar

quality and character from a licensee as it would receive from the licensor, if in fact there

is no such similarity.  *Id.*  Because "the public is hardly in a position to uncover deceptive

uses of a trademark before they occur," the duty is placed on the licensor.  *Id.* at 367.  A

"naked license" is a license to use a trademark without sufficient quality control provided

by the licensor.  Under the naked licensing doctrine, a naked licensor may be estopped

from challenging a breach of a licensing agreement, or even be deemed to have

involuntarily abandoned the rights to the mark.  *See E.G.L. Gem Lab Ltd. v. Gem Quality

Inst., Inc.,* 90 F. Supp. 2d 277, 300 (S.D.N.Y. 2000), *aff'd,* 4 Fed. Appx. 81, 2001 WL

170455 (2d Cir. 2001) ("A licensor must exercise some degree of supervision over the

licensee on pain of abandonment of the mark."); *see also* 3 J. THOMAS MCCARTHY,

MCCARTHY ON TRADEMARK AND UNFAIR COMPETITION § 18:63 (4th ed. 2009).

　　　　Accordingly, the public interest served by WLO's naked licensing challenge is the

prevention of the restaurant-going public from being misled into believing that one will

receive a product of similar quality and character at the WLO restaurants as they will

receive at the HSW restaurants in the alleged absence of adequate quality control by

HSW.  *See Dawn Donut Co.*, 267 F.2d at 367 (The naked licensing doctrine prevents "the

danger that products bearing the same trademark might be of diverse qualities."). Courts have generally been skeptical as to the weight of this public interest. *See Idaho Potato Comm'n*, 335 F.3d at 136 ("[C]ourts . . . have generally precluded licensees from challenging the validity of a mark they have obtained the right to use."); *E.G.L. Gem Lab Ltd.*, 90 F. Supp. 2d at 291-92 ("The public interest in promoting challenges to the validity of trademarks, if indeed there is any, therefore is not nearly as weighty as in the patent area."); *Beer Nuts, Inc. v. King Nut Co.,* 477 F.2d 326, 329 (6th Cir. 1973) ("When the balancing test is employed in the instant situation, we conclude that the public interest in [trademarks] . . . is not so great that it should take precedence over the rule of the law of contracts that a person should be held to his undertakings."), *as quoted in Idaho Potato Comm'n*, 335 F.3d at 136.

When weighing the public interest at stake in the challenge to the license, "the party seeking rescission of the contract must show more than mere likelihood of confusion. '[A] party entering into [an agreement] with respect to a trademark will be held to his contract unless enforcement of the contract would result in *injury* to the public through confusion.'" *Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 103 F. Supp. 2d 711, 738 (S.D.N.Y. 2000) (*quoting VISA Int'l Serv. Ass'n v. Bankcard Holders of America,* 784 F.2d 1472, 1473 (9th Cir. 1986)). Sufficiently grave injuries include misleading the public into buying the wrong insurance based on reputational confusion or depleting the general stock of vocabulary available to refer to commercial goods and services. *See Times Mirror Magazines, Inc.*, 103 F. Supp. 2d at 738 (*citing VISA Int'l,* 784 F.2d at 1474 nn. 1 & 2 (confusion between two credit card insurers would cause injury because "purchasers of insurance . . . may well base their decisions on the

reputation and financial strength of the supplier"); *Kegan v. Apple Computer, Inc.,* No. 95 Civ. 1339, 1996 WL 667808, at *3 (N.D.Ill. Nov. 15, 1996) (finding injury because appropriation of a mark "could harm the public in that other businesses would be estopped from using that word to describe their products")).

On the other hand, public confusion between two restaurants that have contracted to use the same name has been held insufficient to constitute injury. *Proriver, Inc. v. Red River Grill, LLC,* 83 F. Supp. 2d 42, 45 (D.D.C. 1999). The *Proriver* court noted that the only harm that could result from having two similarly named restaurants in the same metro area is that patrons could inadvertently dine at one restaurant rather than the other. This potentiality was deemed insufficiently harmful because, just as in the instant case, there had been no allegation that the quality of food was lower at one restaurant than at the other. *Id.* at 46; (*see* Kyung Hee Paik Dec. ¶ 3.d ("To the Defendant's credit, the food and decor of its restaurants have always met our standards.")). The court noted that "at most," a patron who realized his mistake would "be forced to either correct his mistake by traveling to the desired restaurant, settle by patronizing the non-desired restaurant, or patronize neither restaurant. None of these outcomes can be deemed a significant injury to the public." *Proriver, Inc.*, 83 F.Supp.2d at 46.

In the instant case, no two "Woo Lae Oak" restaurants operate in the same metro area or even the same state. A misled customer who knew of the Chicago or Virginia locations and went to the New York location believing it was subject to quality control by HSW would face one of two situations. Either she would fail to realize her mistake and eat at the restaurant, suffering no lack of quality based on the parties' own allegations, or she would realize her mistake and realistically face only two choices: patronize the New

York location or decide not to patronize it. This choice similarly cannot be deemed a significant public injury, especially in the absence of any alleged quality deficiency in the WLO restaurants. *See id.* Accordingly, the public interest served by HSW's naked licensing challenge is minimal.

Several weighty interests lie on the other side of the balance. First, there is the "strong public interest in protecting the reliance that contracts induce." *Times Mirror Magazines, Inc.*, 103 F. Supp. 2d at 740. It took more than six years after the previous trademark-related action between the parties to agree to a License Agreement, which included an express term prohibiting WLO from challenging HSW's rights in the Mark. (Hyung Kee Paik Dec. ¶ 2.c.) "The interests of justice would not be served if this Court were to tear up those agreements now." *Times Mirror Magazines, Inc.*, 103 F. Supp. 2d at 740.

Second, there is the public interest in enforcing settlements with regards to trademark disputes. *See Idaho Potato Comm'n*, 335 F.3d at 136 ("In general, a party entering into a settlement agreement with respect to a trademark will be held to his contract unless enforcement of the contract would result in injury to the public through confusion.") (*quoting VISA Int'l Serv. Assn. v. Bankcard Holders of America,* 784 F.2d 1472, 1473 (9th Cir. 1986)); *Times Mirror Magazines, Inc.*, 103 F. Supp. 2d at 740 (Noting "the strong public interest in 'the judicial policy of encouraging extra-judicial settlement of trademark litigation'") (*quoting T & T Mfg. Co. v. A.T. Cross Co.*, 587 F.2d 533, 533 (1st Cir. 1978), *cert. denied,* 441 U.S. 908 (1979)). Although WLO has vigorously argued that the 2007 License Agreement did not settle the litigation dismissed in 2001, there can be no dispute that (i) actual trademark litigation occurred, which was

dismissed because a settlement was contemplated, and (ii) the parties at a later date entered into an agreement that purported to consensually resolve the very same issue disputed in the prior litigation, namely, ownership of the Mark.  Based on these facts, it is unnecessary to closely examine the vagaries of the parties' settlement history. Regardless of whether WLO signed the License Agreement with the intent of settling the prior litigation, the License Agreement would have the effect of consensually resolving an issue that was in fact litigated and would otherwise have to be litigated in the future. The same public interest in enforcing settlements is thus served in the instant case.[2]

Accordingly, having weighed the relevant public interests, the Court concludes that WLO is estopped from challenging HSW's ownership of the mark pursuant to the doctrine of licensee estoppel.  HSW's motion for partial summary judgment is granted and WLO's motion for partial summary judgment is denied to that extent.[3]

### a.  Individual Liability of Defendant Young Sook Choi

WLO moves for summary judgment dismissing the claims against Defendant Young Sook Choi ("Choi"), owner and president of WLO-50, in her individual capacity. Under New York law, "[P]iercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in the plaintiff's injury."  *JSC Foreign Economic Ass'n Technostroyexport v. Int'l Development and Trade Servs., Inc.*, 386 F. Supp. 2d 461, 465 (S.D.N.Y. 2005) (*citing Morris v. N.Y. State Dep't of Taxation and Fin.,* 82 N.Y.2d

---

[2] The Court notes that even absent the public interest in enforcing settlements, WLO has not put forward evidence of a sufficiently grave injury to the public to defeat HSW's argument for licensee estoppel.
[3] WLO has not opposed HSW's breach of contract claim on any other basis than a naked licensing challenge, and so further consideration is unnecessary.

135 (1993)).  Even assuming that Plaintiff could show complete domination, Plaintiff has not shown that the "owners of the corporation, through their domination of the corporation, 'abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene.'"  *Id.*  As WLO points out, HSW has alleged "garden variety trademark infringement," breach of contract, and associated wrongs.  (Def's Reply Mem. 8.)  HSW has not shown that the corporate form and abuse thereof was relevant to the perpetration of the alleged wrongs, and so piercing of the corporate veil is inappropriate in this case.

HSW also argues that Choi is personally liable for trademark infringement without the necessity of piercing the corporate veil.  *See Mattel, Inc. v. Internet Dimensions Inc.*, No. 99 Civ. 10066 (HB), 2000 WL 973745 (S.D.N.Y. July 13, 2000) ("If an individual actively and knowingly caused the trademark infringement, he is personally responsible. Specifically, a corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity, is personally liable for such infringement *without regard to piercing of the corporate veil."*) (*quoting Babbit Electronics, Inc. v. Dunascan Corp.,* 38 F.3d 1161, 1184 (11th Cir. 1994) (emphasis added)); *Monsanto Co. v. Haskel Trading, Inc.,* 13 F. Supp. 2d 349, 354 (E.D.N.Y. 1998) ("While a corporate officer is not necessarily individually liable for torts committed on behalf of the corporation, personal liability for trademark infringement and unfair competition is established if the officer is a moving, active conscious force behind [the defendant corporation's] infringement.") (citations and internal quotation marks omitted). The parties dispute whether Choi's involvement in the alleged trademark infringement is sufficient under this standard.  Because the parties have not moved for summary

judgment on the trademark infringement claims and have not briefed the issue, the Court reserves decision as to whether Choi may be held personally liable on the trademark infringement claims until an appropriate juncture when the issue may be considered in tandem with the merits of the underlying trademark infringement claims.

**IV.     Conclusion**

Based on the foregoing, the Court grants HSW's motion for partial summary judgment and denies WLO's motion for partial summary judgment on the breach of contract claim based on licensee estoppel. The Court grants WLO's motion for partial summary judgment insofar as piercing the corporate veil is inappropriate in this case, but reserves decision as to whether Defendant Choi can be held personally liable for trademark infringement. The parties are to confer and submit a schedule for further proceedings in this matter to the Court by March 1, 2010.

SO ORDERED.

Dated: _____, 2009
        New York, NY

                                        _____
                                              U.S.D.J.

11